NOT DESIGNATED FOR PUBLICATION

No. 126,984

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.J., a Minor Child.

MEMORANDUM OPINION

Appeal from Riley District Court; JOHN BOSCH, judge. Submitted without oral argument. Opinion filed December 20, 2024. Affirmed.

*Vasiliki Dadiotis*, of the Law Firm of Tenopir and Huerter, of Topeka, for appellant natural mother.

*David Lowden*, deputy county attorney, and *Barry R. Wilkerson*, district attorney, for appellee.

Before CLINE, P.J., MALONE and BRUNS, JJ.

PER CURIAM: Mother appeals the district court's termination of her right to parent J.J. (YOB: 2019). She argues on appeal that (1) there was insufficient evidence to support the district court's finding that she was unfit, (2) there was insufficient evidence to support the district court's finding that her conduct or condition was unlikely to change in the foreseeable future, and (3) the trial court abused its discretion by ordering partial sequestration of witnesses. Father appeals separately. After thoroughly reviewing the record, we find no error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On June 12, 2021, at 5 a.m., Riley County Police Officer Beaubien was dispatched to the Super 8 Motel in Manhattan. Mother was in the lobby, intoxicated and screaming while holding a naked J.J. The motel clerk had called police. The clerk told police that

1

Mother made a comment about a man being in the room with her whom she wanted out of the room. Police never found the man. Mother's screaming and cursing continued until the clerk asked police to arrest her for criminal trespass. Mother agreed to get her belongings from her motel room, but had difficulty carrying J.J. up the stairs, putting the child on her head in an unsafe manner.

Outside the motel room door police noticed two 12-ounce bottles of beer on the floor. Inside the room they found cigarette butts all over the floor and an open bottle of whiskey with a missing lid. Toys and grapes were strewn on the floor. Mother refused to identify herself, but police found a pill bottle on the motel room floor with her name on it. Mother refused officers' requests to clothe the child and gather her belongings. Beaubien handcuffed Mother, and officers put her in the back of a patrol car. She was arrested for criminal trespass, child endangerment, and disorderly conduct. J.J. was placed into police protective custody.

At the temporary custody hearing on June 16, 2021, the district court placed J.J. in the custody of the Secretary of the Department for Children and Families (DCF) in out-of-home placement. The court ordered Mother to obtain a drug and alcohol evaluation and submit to random urinalysis (UA) testing. The court also ordered Mother to pay child support of $25 per month.

An amended petition was filed on July 7, 2021, naming Father. J.J. was adjudicated as a child in need of care (CINC) on July 21, 2021. The initial case plan goal was reintegration. A permanency hearing was held on May 25, 2022. The district court found that reintegration continued to be a viable goal. Another permanency hearing was held September 19, 2022, and continued to October 24, 2022. At that time, the district court found that reintegration was no longer viable.

The State filed an amended motion to terminate Mother's and Father's parental rights on November 29, 2022. The district court held a trial over three days on the State's amended motion: March 8, 2023; June 9, 2023; and July 7, 2023. A summary of the evidence presented, as it pertains to Mother, follows.

Kayla Sloan, Mother's therapist with Pawnee Mental Health, testified that she had treated Mother for just about a year. She saw Mother two to four times a month focused on depression, stress related to the CINC case, and past trauma. Sloan testified that Mother was diagnosed with alcohol use disorder, in remission since June 15, 2021, Bipolar I, and PTSD. Mother also self-reported in her psychological assessment on July 23, 2021, that she was diagnosed with borderline personality (disorder) and ADHD. Sloan stated that Mother was open and engaged in therapy and appeared to use the coping skills they had discussed in session in her everyday life. Sloan clarified that her treatment of Mother is considered level one outpatient treatment for the alcohol disorder and that Mother completed that treatment, but was continuing to be treated for mental health reasons.

Elena Zocca, case manager with Saint Francis Ministries (SFM), the agency appointed to provide case management for CINC cases, testified for the State. It was her job to go over case plan tasks with the parents and assist them in completing them. Mother's case plan tasks included: remaining in contact with SFM; signing all necessary releases; working with the intake worker for the first 90 days; maintaining stable, clean housing; maintaining employment; participating in an age-appropriate parenting class; participating in the Infants and Toddler program; obtaining a mental health evaluation and following recommendations; and completing a drug and alcohol evaluation and following all recommendations.

Zocca testified that Mother had changed houses and had stayed in a shelter sometime during the case, and that during walkthroughs of her house they had concerns

3

about dog feces and urine not being cleaned up. She said it was an issue they had to address a few times. Zocca testified that Mother did not maintain the same employment throughout the case and had periods of unemployment. She said that Mother was most recently employed at a gas station.

Zocca acknowledged that Mother had completed all the remaining case plan tasks. SFM added one task that child locks be installed on the doors at all times, and Mother complied. Another case plan task was added on March 30, 2022, that Mother follow a no contact order between J.J. and Taylor Morris, Mother's ex-boyfriend. There were concerns that Mother did not comply with this case plan task. Zocca testified that the agency had concerns about Morris because he had been aggressive toward Mother.

On October 8, 2021, Mother spoke with Zocca about her contact with law enforcement and her effort to get a protection from abuse (PFA) order put on Morris. As late as September 19, 2022, Zocca had concerns that Mother was continuing to have contact with Morris. SFM put together a safety plan on March 1, 2023 concerning Mother's continued contact with Morris. Zocca admitted on cross-examination that Mother completed the majority of her case plan tasks, but the issue preventing reintegration was her contact with Morris. Mother's visits were decreased after November 2022 because Morris had been around Mother and J.J. Zocca did not think Mother was able to protect J.J. adequately.

On May 19, 2022, Zocca met with Mother about her housing—specifically that the family support worker noted a dry pile of dog feces on the floor in the house. Zocca presented Mother with a safety plan that identified Mother's dogs as "'dangerous dogs'" within the city's code and that workers have "seen multiple piles of dog feces as well as urine on the floor when arriving at [Mother's] residence for her visitation with [J.J.]." The plan of action given to Mother included that Mother would keep her home clean and free from dog feces and urine at all times, that Mother would take her dogs outside throughout

the day to ensure they were urinating/defecating outdoors, and that Mother would comply with the city's criteria on ownership of dangerous dogs.

When asked about concerns with reintegration, Zocca replied, "A long term stability for employment, knowing that she can't provide the financial stability for [J.J.] for her needs and the contact with [Morris] which should not be around the child." At the time of the termination hearing, Mother's visitation with J.J. was supervised. Zocca testified that Mother had four-hour visits once a week, but they were decreased to an hour or two hours due to Mother allowing contact with Morris.

Sam Shubert, a Riley County police officer, testified that he met with Mother on December 11, 2022, at her house. She reported that Morris came by her house in violation of the no contact order, and Mother suspected he damaged her car. Someone had carved FU into the hood of her car and damaged the driver's side.

Andrew Lee, a Riley County police officer, testified that he was dispatched to Mother's house on February 1, 2023. Dispatch told him that it was a domestic disturbance between Mother and Morris where Mother alleged that Morris pushed her. When Lee arrived, he met with Mother outside her residence, and she told him that she had an altercation with Morris inside. Lee confirmed that there was a PFA order that Morris was not to be at Mother's house. Mother told Lee that Morris knocked on her back door and because he was "being civil towards her" she let him inside. Then Mother and Morris argued and at one point he was in her bedroom. She heard him breaking items, and she heard him break a door. Then Mother said that Morris pushed her on to the ground. That is when Mother left and called 911.

Adam Peterson, a Riley County police officer, testified that he arrested Morris on violation of a PFA order and took him to the Riley County Jail on February 1, 2023, after Mother reported him at her house. Peterson said he followed up by phone with Mother,

who said she had not seen Morris before calling the police on February 1. Mother called him back about an hour later and admitted to being untruthful. She said that Morris showed up at her house the morning of February 1 and got into her car as she was leaving to go to Wal-Mart. He remained in her car while she was inside Wal-Mart. Mother then went to Target where she was supposed to meet with a caseworker. Again, Morris remained in her car. She drove back home and then called the police.

Paige Gottwald, permanency specialist with SFM, testified about her conversations with Mother surrounding the February 1, 2023, incident with Morris. She said Mother called her on February 1 and said, "'[H]e came over and was damaging my property and shoved me but this all happened after [J.J.] had left.'" Then on February 6, Mother called and told a different story. This time she said that J.J. had been dropped off at her house and as she was putting J.J. in the car Morris showed up. Mother said Morris was "a little escalated" and she was afraid. Morris demanded to see J.J., who according to Mother still calls Morris "daddy." Mother said she did not know what to do so she let Morris go with them to Wal-Mart. Then after J.J. had been picked up, Mother and Morris returned to Mother's house. That is when Morris began breaking things and shoving Mother. Mother was afraid that Morris would get out of jail and come after her.

Emily Selby, J.J.'s court appointed special advocate (CASA), testified that she was appointed in January 2022. Selby testified that J.J. and Mother have a close bond. According to Selby, Mother spoke with her in July 2022 and said she has been "having daily contact with" Morris. Mother added that "if she had to just be friends with [Morris] to get [J.J.] back that she would do that." Mother told Selby that Morris would never be violent with J.J. and that if he became angry while J.J. was present, he "would just walk away."

Jenifer Nichols, an intake/parent support worker with SFM, testified that she worked with the parents for the first 90 days of the case. Nichols said that Mother signed

6

all the necessary paperwork and seemed like she was open to services. At that time, Mother was staying with her boss and trying to get more permanent housing. Nichols thought that Mother was getting two to three visits with J.J. per week. She observed them together at visits and reported that J.J. was "very excited to see her mom" and that Mother "was very attentive and [the] interaction was appropriate."

Nichols testified that Mother obtained an apartment during those first 90 days, and also acquired some dogs. Nichols said, "There was a strong animal smell. There were some spots where the dog had urinated or defecated onto the floor." She added that she witnessed it on both of the two visits she made to Mother's house.

Amanda Easton, a permanency specialist with SFM, testified that she was assigned to this case in February 2022. She worked on the case for three months—February, March, and April 2022. Easton testified that the agency had concerns about Morris, and they spoke to Mother about those concerns. Once, in early February 2022, a man answered the door at Mother's apartment. Easton was concerned because there was already a safety plan that Mother was not to have Morris in her home. Easton called Mother who denied that Morris was in her home. But Easton said the man "looked similar" to Morris and she confirmed that Morris had been released from jail.

Easton testified about her concerns with Mother's two dogs. She said that "they were urinating in the home and it was not being cleaned up." Easton explained that this was a safety hazard because J.J. was a small child and was getting the pet urine on her hands and clothes. Easton testified that during these few months she was on the case there were doctor's orders for J.J.'s food to be logged. There was a concern that J.J. was underweight. Easton said that Mother struggled with filling out the logs. J.J. was not to eat dairy products. This was explained to Mother, but there were times when J.J. would have dairy at Mother's house.

7

Rebekah Castle, a caseworker with SFM, testified that she worked this case the entire time it has been open except for February, March, and April 2022. She prepared a fairly comprehensive timeline of visitation starting in June 2021 and continuing through May 18, 2023. It was admitted as State's Exhibit No. 18.

Castle and Zocca met with Mother at her house on May 19, 2022. There were concerns with Mother's dogs at that time. The dog waste was not being cleaned up consistently. According to Castle's timeline, the issues with dog waste in the house persisted throughout May 2022 and into July 2022. The last mention of any incidents with dog waste was July 26, 2022. It appears from the record that Mother maintained a clean house since that time. Castle testified that Mother informed her on December 14, 2021, that she had lifted the PFA against Morris. Castle reminded Mother that Morris was a safety risk, and when Mother asked if Morris could be added to the case plan, the agency's response was "No."

Castle called Mother on July 25, 2022, to remind her that it was a safety concern for Morris to be at Mother's house. Castle testified that she dropped in on Mother's overnight visit with J.J. the next day to see if Morris was there. Castle asked Mother if she had any contact with Morris since he was recently released from jail, and Mother said, "[N]o." As Castle was getting ready to leave, Mother's dogs ran out the door. Mother went to get them, and Castle stayed with J.J., who was naked. Castle went into Mother's room to get a diaper, and she found Morris standing in the shower with his shirt off. Castle took J.J. and informed Mother that the visit was over.

Just a month later, Mother asked Castle again if Morris could be added to the case plan. Castle testified that she was concerned because Mother "didn't see the severity of having him around and the danger that the case team was seeing." Castle testified that in her opinion reintegration was no longer viable.

8

The district court then admitted the State's Exhibit No. 19, which was an adjudication for two of Mother's other children where her parental rights had been terminated. The State then rested its case.

Mother called a friend, Steven Hope, to testify. He testified that he witnessed Mother with J.J. prior to J.J. being in foster care, and that Mother was a great mom. He had no concerns with Mother drinking or being abusive with J.J. When asked about Morris, Hope said, "[H]e's just—has good times and bad times, but I just—not a good character for her to be around in my opinion."

Ethen Neary, another friend of Mother's, whom she refers to as her brother, testified on Mother's behalf. He had no concerns about Mother drinking or using substances. Neary testified he had seen J.J. maybe once or twice. Neary confirmed that Mother's apartment smelled from the dog waste on the floor.

Mother testified that she had twin boys a month before her 21st birthday. One of the boys had special needs. The boys were put into foster care when they were almost two years old. About a year later her parental rights were terminated. When asked what her plan was if Morris were released from jail, Mother replied that she would not live in Manhattan because "he can find me anywhere here in Manhattan." Mother said she had a current PFA against him and would call the police immediately if he showed up at her house. On cross-examination Mother said she did not want to be around Morris, but she struggled with that because "[h]e was a big part of [her] life for a long time."

E.W., the foster placement, testified that J.J. was very excited for the days when she was to visit with Mother. E.W. testified that sometimes after visits J.J. acted normal and other times she displayed "dis-regulation" including "kicking the wall, screaming at the wall, biting my neck, biting my children." E.W. testified that starting in the first week of February 2023, J.J. wrestled with her behavior, and that was when E.W. began seeing

9

J.J. kick the wall and scream. This behavior would have coincided with the incident where Morris got in the car with Mother and J.J.

At the conclusion of testimony on June 9, 2023, the district court ordered visitation to remain supervised for one hour each week until the parties reconvened on July 7, 2023, for closing arguments and a decision on the matter.

On July 7, 2023, the district court noted that J.J. had been in state custody close to 25 months. It recognized that Mother had parenting time with J.J. throughout the case, but one major concern was the many problems with dog feces and urine left in the home. The district court was concerned about Mother's untruthfulness concerning the incidents with Morris—lying to the police about when Morris arrived at her house and lying to the caseworkers about Morris hiding in the shower. The district court found Mother unfit under K.S.A. 38-2269(b)(1), (b)(2), (b)(4), (b)(7), (b)(8), (c)(1), (c)(2), and (c)(3). It also found that Mother was presumed unfit under K.S.A. 38-2271(a)(1) and (a)(5), and that she failed to rebut those presumptions. The district court also found that Mother's "conduct or condition is unlikely to change in the future." The district court found that it was in J.J.'s best interests for Mother's parental rights to be terminated. Mother timely appealed the district court's judgment.

WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE DISTRICT COURT'S
FINDING THAT MOTHER WAS AN UNFIT PARENT?

Mother first claims there was insufficient evidence to support the district court's finding that Mother was an unfit parent. The State responds there was clear and convincing evidence of Mother's unfitness viewed in the light most favorable to the State.

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-

10

findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). When reviewing these decisions, this court does not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

Under K.S.A. 38-2269(a), to terminate a parent's rights, the State must prove "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The district court may rely on the list of nonexclusive factors in K.S.A. 38-2269(b)-(e) to determine whether a parent is unfit. See *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021). A single factor may be enough to terminate parental rights. K.S.A. 38-2269(f); 61 Kan. App. 2d at 323. The district court may also rely on one or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 38-2271. Termination requires evidence of unfitness in the present and the foreseeable future. K.S.A. 38-2269(a); 61 Kan. App. 2d at 323.

The district court found Mother unfit based on 10 statutory factors:

1. K.S.A. 38-2269(b)(1) (emotional illness, mental illness, mental deficiency or physical disability);
2. K.S.A. 38-2269(b)(2) (conduct toward a child of a physically, emotionally or sexually cruel or abusive nature);
3. K.S.A. 38-2269(b)(4) (physical, mental or emotional abuse or neglect or sexual abuse of a child);
4. K.S.A. 38-2269(b)(7) (failure of reasonable efforts made by agencies to rehabilitate family);
5. K.S.A. 38-2269(b)(8) (lack of effort of parent to adjust the parent's circumstances, conduct, or conditions to meet needs of child);

11

6. K.S.A. 38-2269(c)(1) (failure to assure care of child in parental home when able to do so);

7. K.S.A. 38-2269(c)(2) (failure to maintain regular visitation);

8. K.S.A. 38-2269(c)(3) (failure to carry out reasonable plan approved by the court toward reintegration in the parental home);

9. K.S.A. 38-2271(a)(1) (presumed unfit because previously found to be unfit); and

10. K.S.A. 38-2271(a)(5) (presumed unfit because child out of home for one year or longer and parent failed to carry out reasonable plan toward reintegration).

Mother asserts that the State failed to establish by clear and convincing evidence that Mother was unfit. It is important to note that on appeal Mother only disputes the evidence related to the five factors under K.S.A. 38-2269(b)—she does not contest the district court's findings of unfitness under the three factors in K.S.A. 38-2269(c). Nor does Mother contest the district court's findings that the presumptions in K.S.A. 38-2271(a)(1) and (a)(5) applied to her. The State submits that Mother's failure to challenge all grounds constituting the district court's findings of unfitness means that Mother cannot establish error in the district court's decision to terminate her parental rights.

The State is correct.

"When a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of both alternative bases on appeal, an appellate court may decline to address the appellant's challenge to the district court's ruling. *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 280, 225 P.3d 707 (2010)." *In re T.E.B.*, No. 119,535, 2018 WL 6253400, at *3 (Kan. App. 2018) (unpublished opinion).

12

"An appellant's failure to address all the alternative grounds for the district court's judgment renders the issues on appeal academic and unassailable." *In re K.C.D.*, No, 119,056, 2018 WL 6253333, at *4 (Kan. App. 2018) (unpublished opinion). Issues not adequately briefed are considered waived or abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

Because five factors remain uncontested, even if the district court erred in ruling Mother unfit under the factors contested by Mother, it would not warrant reversal of the district court's judgment. In a similar case, this court found that because the parent failed to challenge all the bases on which the district court relied to find him unfit, which included the presumption that he was unfit under K.S.A. 38-2271(a)(3), this court could "simply address whether terminating his parental rights was in the best interests of the child." *In re D.E.*, No. 120,244, 2019 WL 1412432, at *4 (Kan. App. 2019) (unpublished opinion). Here, Mother fails to challenge the district court's findings under K.S.A. 38-2269(c) and K.S.A. 38-2271(a). She also does not contest the district court's ruling that termination was in J.J.'s best interests. We could uphold the district court's finding that Mother was unfit, for this reason alone. In any event, we will address Mother's arguments that the evidence was insufficient to find her unfit under K.S.A. 38-2269(b).

1. *K.S.A. 38-2269(b)(1) (emotional illness, mental illness, mental deficiency or physical disability)*

A district court may find a parent unfit if there is clear and convincing evidence that the parent suffers from an emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render that parent unable to care for the ongoing physical, mental, and emotional needs of his or her child. K.S.A. 38-2269(b)(1). The record establishes that Mother has a mental illness. Sloan testified that Mother was diagnosed with alcohol use disorder, Bipolar I, and PTSD. Mother also self-reported that she was diagnosed with borderline personality disorder and ADHD.

13

There was no evidence that Mother continued to use alcohol during the case. Mother also complied with the requirement to undergo therapy. She met with a therapist at Pawnee Mental Health throughout the case. Sloan stated that Mother was open and engaged in therapy and appeared to use the coping skills they had gone over together in session in her everyday life. Sloan clarified that her treatment of Mother is considered level one outpatient treatment for the alcohol disorder and that Mother completed that treatment. Mother testified that she would continue in therapy after reintegration.

The district judge's findings under this factor included:

"I think it's obvious that during the lifetime that [J.J.'s] been alive that she's put her needs before the child's needs. Now, was that because she was intoxicated, whether she was suffering from PTSD or bipolar incident, I don't know. But it's—the evidence is such that she's had lifelong issues as she testified to. And it appears to this Court that it's clear and convincing that she—that her mental state is such that she's unable to care for the child's physical, mental, and emotional needs."

The State cites *In re A.S.*, 12 Kan. App. 2d 594, 752 P.2d 705 (1988), for the proposition that termination can be appropriate under this factor when a mother focuses on a romantic relationship instead of the child. The State asserts that Mother's emotional or mental deficiency impacted her decision making, which caused her to lose unsupervised visitation. In *In re A.S.*, the mother was so focused on manipulating her boyfriend that she faked a suicide attempt and forgot that her child was unattended. 12 Kan. App. 2d at 597. The facts of *In re A.S.* were considerably more extreme than here. We find the State failed to present clear and convincing evidence to support the district court's finding that Mother was unfit under K.S.A. 38-2269(b)(1) even when that evidence is viewed in the light most favorable to the State.

14

2. *K.S.A. 38-2269(b)(2) (conduct toward a child of a physically, emotionally or sexually cruel or abusive nature)*

Under K.S.A. 38-2269(b)(2), a person's parental rights may be terminated due to "conduct toward a child of a physically, emotionally or sexually cruel or abusive nature." The district court's findings of unfitness under this factor were:

> "Primarily the condition of the home, allowing the child to be present when there are such terrible home conditions with the animal feces and urine and filth of the home that that is abusive. Also, the fact that she allows an abusive domestic partner to be in the home around the child places the child in such—in a dangerous situation."

The evidence in the record about the presence of dog feces and urine in Mother's home was limited to May 2022 through July 2022. Zocca testified that Mother had completed all case plan tasks, except those pertaining to Morris, indicating that the agency considered Mother to have maintained clean and stable housing. Mother had visitation with J.J. at her home through most of the case. The visits were held in the community only after the agency's concern that Morris would be present in Mother's home. The evidence as to the dogs' waste was not sufficient to find unfitness under this factor. But the evidence that Mother allowed her abusive domestic partner to be in the home and around J.J. was sufficient to find her unfit under this factor.

"A parent's failure to protect his or her child from abuse constitutes 'conduct toward a child of a physically, emotionally or sexually cruel or abusive nature' under K.S.A. 2008 Supp. 38-2269(b)(2)." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 7, 204 P.3d 1182 (2009). In *In re S.D.*, this court interpreted the meaning of subsection (b)(2) and found that it "plainly evidences the intent to cover abusive conduct other than actual direct physical abuse." 41 Kan. App. 2d at 789. There was no evidence that Mother directly abused J.J., but her failure to follow the no contact order with Morris constituted conduct of an abusive nature. A similar situation was presented in *In re S.D.* There, one

15

of the requirements of the mother's case plan was to have no contact with an abusive domestic partner, A.Q., and to not allow S.D. to have contact with A.Q. Months later, when family support workers went to the mother's home, they saw A.Q. leave out the back door. The mother signed a safety plan where she agreed to have no contact with A.Q. Yet, she was found harboring him after he escaped from custody. This court found that the no contact order was reasonable and the mother's repeated failure to comply with it, along with other factors, supported its finding of unfitness under K.S.A. 38-2269(b)(2). 41 Kan. App. 2d at 791.

Here, Mother also repeatedly violated the no contact order and then lied to caseworkers about her conduct. We find that the evidence, viewed in the light most favorable to the State, was sufficient to support the district court's finding of unfitness under K.S.A. 38-2269(b)(2).

3. *K.S.A. 38-2269(b)(4) (physical, mental or emotional abuse or neglect or sexual abuse of a child)*

The court may terminate a person's parental rights if the court finds the parent unfit because of "physical, mental or emotional abuse or neglect or sexual abuse of a child." K.S.A. 38-2269(b)(4); *In re D.G.*, 319 Kan. 446, 453, 555 P.3d 719 (2024). The district court used the same evidence to conclude Mother was unfit under K.S.A. 38-2269(b)(4) as it relied on under (b)(2).

Exposure to domestic abuse constitutes emotional abuse. See *In re A.H.*, 50 Kan. App. 2d 945, 950, 334 P.3d 339 (2014) (affirming decision finding A.H. a CINC under the definition of emotional abuse due to being exposed to domestic violence). The *In re A.H.* panel stated that "A.H. witnessed domestic violence," which "supports a finding of emotional harm." 50 Kan. App. 2d at 950. Similarly, J.J. witnessed the incident in the hotel that precipitated her removal from Mother's custody. And despite having a PFA

16

against him, Mother allowed Morris into her home and her car during visits with J.J. on July 26, 2022 and February 1, 2023.

Viewing the evidence in a light most favorable to the State, a rational fact-finder could conclude it was highly probable that Mother abused J.J. emotionally. Thus, the State presented sufficient evidence to support the district court's finding of unfitness under K.S.A. 38-2269(b)(4).

4. *K.S.A. 38-2269(b)(7) (failure of reasonable efforts made by agencies to rehabilitate family)*

K.S.A. 38-2269(b)(7) states the court shall consider "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." This record shows that the agencies' efforts were reasonable.

The district court noted the "many services" that the caseworkers provided to Mother. It also noted that one of the biggest problems under this factor was Mother's failure to keep appointments for visitation. The district court stated every time an appointment was canceled, J.J. "would have some serious behavior problems." The district judge pointed to E.W.'s testimony about J.J.'s behavior and stated:

> "I think the mother—the foster mother explained it as being dis-regulation. I believe that was her testimony. The child would be dis-regulated. She would come home kicking the walls, biting her neck, and biting other children. She had bowel issues, she would scream at the foster father, she was combative, and this would go on for 45 minutes or so."

Mother correctly points out that the district court was describing J.J.'s behavior after she had a visit with Mother, not after a cancellation. E.W. testified that sometimes after a visit with Mother, J.J. would act "normal" and other times it would be this intense "dis-regulation." What E.W. said about J.J.'s behavior after a canceled visit was that J.J.

17

would be sad and cry a lot. Once, after a canceled visit, E.W. witnessed J.J. "pound[ing] on the door calling for mommy."

While the district court's reasoning under this factor focused on cancellation of visitation, none of the caseworkers who testified noted this as a concern. The timeline of visitation prepared by Castle lists Mother's visitation from June 2021 through May 2023. In that time, Mother missed only a handful of visits. A visit was missed on February 21, 2022, but it was unclear from the record which party canceled or why. Mother canceled the visit on May 11, 2022, because the air conditioning in her apartment was not working and she did not want to expose J.J. to excessive heat. Mother failed to confirm a visit on August 3, 2022, and it was canceled by the caseworkers due to not receiving communication from Mother. Mother canceled visits on October 26, 2022, and November 18, 2022, because she was sick. The visit on February 8, 2023, was canceled due to the incident with Morris and Mother not admitting to caseworkers that he was at the visit. Mother attended all other scheduled visits.

Mother points out the disconnect between the district court's ruling and E.W.'s testimony but fails to address the efforts of the caseworkers to rehabilitate the family. The record shows the agency provided many services to Mother including case management, flex funds, transportation assistance, monitoring of visitation, UAs, not to mention foster care for the child. The biggest impediment to reintegration was not a lack of efforts by SFM, but Mother's failure to follow the no contact order with Morris. When viewed in the light most favorable to the State, there was clear and convincing evidence to support the district court's finding that Mother was unfit under K.S.A. 38-2269(b)(7).

*5. K.S.A. 38-2269(b)(8) (lack of effort of parent to adjust parent's circumstances, conduct, or conditions to meet needs of child)*

K.S.A. 38-2269(b)(8) provides that "[i]n making a determination of unfitness the court shall consider . . . [the] lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." When analyzing this factor, the district court stated, "When a parent is more concerned about having animals in the home than keeping the home clean for their child, that's obvious to this Court that the parent doesn't take the needs of the child serious."

Mother's argument on this issue consists of one sentence: "Mother testified that she had taken steps to give one of the dogs away by calling the shelter, the police, posting on Facebook." Although the district court focused on the need to keep the home clean of animal filth when discussing this factor, the record shows that Mother's failure to abide by the no contact order between herself and Morris demonstrated a failure to adjust her conduct to meet J.J.'s needs under K.S.A. 38-2269(b)(8).

In *In re R.S.*, 50 Kan. App. 2d 1105, 1119, 336 P.3d 903 (2014), this court upheld a termination decision where the mother had met some case plan tasks but failed at others. When viewing the evidence in a light most favorable to the State, this court concluded there was clear and convincing evidence that the mother had failed to adjust her circumstances to meet the children's needs. 50 Kan. App. 2d at 1117. Here, Mother was unwilling or unable to complete all of the reintegration tasks. When viewed in the light most favorable to the State, there was clear and convincing evidence to support the district court's finding that Mother was unfit under K.S.A. 38-2269(b)(8).

In sum, we find there was clear and convincing evidence to support the district court's findings of unfitness under each statutory ground cited by the court except for K.S.A. 38-2269(b)(1). As we noted earlier, a single factor may be enough to terminate

parental rights. K.S.A. 38-2269(f); *In re E.L.*, 61 Kan. App. 2d at 323. Thus, we affirm the district court's conclusion that Mother was an unfit parent based on the evidence.

WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE DISTRICT COURT'S FINDING THAT MOTHER'S UNFITNESS WAS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE?

"After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a)." *In re D.G.*, 319 Kan. at 459. The court may look to a parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). When assessing the foreseeable future, we use "'child time'" as the measure. See *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014). The revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., recognizes that children experience time differently than adults and that different perception requires a prompt, permanent disposition. K.S.A. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

J.J. was about two years old when this case was filed and she was about four years old at the time of the termination hearing. The district court specifically referenced the fact that it should use child time as the measure, and that "[c]hildren experience the passage of time in a way that makes a month or a year seem considerably longer."

The district court properly considered the foreseeable future from J.J.'s perspective and looked at Mother's past conduct as a reliable indicator of how she would behave. Mother had repeated contact with Morris after being told he was a safety risk and that contact with him would prevent reintegration. On March 30, 2022, SFM added a case plan task for Mother that she follow the no contact order between Morris and J.J. But in July 2022, Mother told Selby she was having daily contact with Morris. On July 26, 2022, Mother lied about having no contact with Morris, and he was found hiding in her

shower during a visit with J.J. In February 2023, Mother allowed Morris to get in the car with her and J.J., and then she lied to caseworkers about his presence. Considering the evidence in the light most favorable to the State, we conclude that a rational fact-finder could have found it highly probable that Mother's conduct or condition of unfitness was unlikely to change in the foreseeable future under K.S.A. 38-2269(a).

## DID THE DISTRICT COURT ABUSE ITS DISCRETION BY PARTIALLY SEQUESTERING THE WITNESSES?

Finally, Mother claims the district court abused its discretion by partially sequestering the witnesses at the termination hearing. But the facts surrounding this claim, as well as Mother's legal arguments about the facts, are somewhat confusing and difficult to follow.

On the first day of the hearing, Mother's counsel asked the district court to sequester all witnesses. The district court denied the request but noted the appearance of Mother's friend, David Voter, and Mother's friend/brother, Neary, in the courtroom. The district court asked Mother, "Are you requesting that your brother and your friend sit in on this hearing?" Mother replied, "Just my brother." The district court then had Voter sit in the hallway. On the second day of the hearing, the State listed the appearances on the record as: Mother, Father, their respective counsel, the guardian ad litem, Castle and Misty Smith from SFM, Meagan Roelofson from CASA, E.W., and "several witnesses." The identity of the "several witnesses" is unclear. Testifying that day were: Nichols, Easton, Gottwald, and Castle, all with SFM; Father; Mother; Mother's friends Hope and Neary; and E.W. No objections were made. No one was directed to wait in the hallway.

"A trial court's decision whether to sequester witnesses is discretionary." *State v. Sampson*, 297 Kan. 288, 292, 301 P.3d 276 (2013). Thus, this court reviews that ruling for an abuse of discretion. *State v. Hulsey*, No. 108,361, 2013 WL 5303534, at *4 (Kan.

App. 2013) (unpublished opinion). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022).

Mother asserts the district court's ruling "sequestered all of Mother's witnesses and allowed the State's witnesses the benefit of hearing the trial testimony." But Voter was the only person identified as removed from the courtroom and he did not testify. Thus, Mother's claim of error is not based on "partial sequestration" as she frames it, since none of her witnesses were sequestered, but in not ordering sequestration of the State's witnesses.

Next, in her brief, Mother offers an argument about the confidentiality of CINC proceedings instead of sequestration of witnesses. Mother claims the district court committed an error of law by violating K.S.A. 38-2247(b), which provides:

> "(b) *Disposition*. Proceedings pertaining to the disposition of a child adjudicated to be in need of care shall be closed to all persons except the parties, the guardian ad litem, interested parties and their attorneys, officers of the court, a court appointed special advocate and the custodian.
>
> (1) Other persons may be permitted to attend with the consent of the parties or by order of the court, if the court determines that it would be in the best interests of the child or the conduct of the proceedings, subject to such limitations as the court determines to be appropriate.
>
> (2) The court may exclude any person if the court determines that such person's exclusion would be in the best interests of the child or the conduct of the proceedings."

Mother contends that the State's witnesses, except for the CASA worker, were not included in the list of persons allowed to attend closed proceedings. Mother notes that K.S.A. 38-2202(bb) defines "party" to include " the State," but argues that the SFM caseworkers and the police officers should not be included in that definition.

The State argues that this argument is presented for the first time on appeal. It asserts: "Although she generally complained about the court's sequestration decision, she did so based upon an issue of fairness to both parties and not on the theory now raised regarding privacy rights in a CINC case." The State is correct. A party may not object on one ground at trial and assert a different objection on appeal. *Fitzpatrick v. Allen*, 24 Kan. App. 2d 896, 903, 955 P.2d 141 (1998). Because Mother did not raise a confidentiality objection to the State's witnesses remaining in the courtroom during the proceedings, and because her objections at trial differ from those on appeal, she has failed to preserve this issue for appellate review. Although there are some exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, Mother does not explain why this issue should be considered for the first time on appeal. Thus, we decline to address Mother's argument that the district court violated K.S.A. 38-2247(b).

That leaves the only preserved issue as whether it was error for the district court to deny Mother's request to sequester the State's witnesses. As stated above, the district court has discretion on whether to sequester witnesses. "The purpose of sequestering a witness is to prevent the witness from tailoring their testimony to conform to the testimony of other witnesses." *In re I.G.*, No. 117,489, 2017 WL 6064026, at *2 (Kan. App. 2017) (unpublished opinion).

Mother contends that the State's second witness, Zocca, "got to 'fill in the gaps'" "by hearing Mother's therapist's testimony [Sloan]." Even assuming, without finding, that the district court abused its discretion in allowing Zocca to avoid sequestration, Mother must show prejudice to prevail on her claim. "Prejudice is necessary. See *State v. Heath*, 264 Kan. 557, 589, 957 P.2d 449 (1998) (recognizing that even if district court abuses its discretion in denying a request to sequester witnesses, the error is not reversible absent evidence of prejudice)." *In re I.G.*, 2017 WL 6064026, at *2.

23

Mother's first assertion of prejudice is that it was "clear error" for the district court to allow Zocca "to provide cumulative testimony regarding information already on the record by [Sloan]." The only information Zocca offered that was similar to that offered by Sloan is Zocca confirmed that Mother completed the drug and alcohol evaluation, the mental health evaluation, and was following the recommendations. That information is helpful to Mother, not prejudicial. And because Mother had signed all releases for SFM to talk with her therapist, Zocca would have had this information independently.

Mother's second assertion of prejudice was that Hope "was not able to give cumulative testimony as he was seemingly sequestered." But as we have stated, nothing in the record suggests that Hope was sequestered. Thus, Mother has failed to show any prejudice caused by the district court's decision to not sequester the State's witnesses.

Affirmed.